

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-12-2004

# Bd Trustees Trucking v. Kero Leasing Corp

Precedential or Non-Precedential: Precedential

Docket No. 03-2176

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Bd Trustees Trucking v. Kero Leasing Corp" (2004). *2004 Decisions*. Paper 439.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/439

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT
OF APPEALS FOR THE
THIRD CIRCUIT

_____

Nos. 03-2176, 03-2344,
03-3283 and 03-3448

_____

BOARD OF TRUSTEES
OF TRUCKING EMPLOYEES
OF NORTH JERSEY WELFARE
FUND, INC-PENSION FUND

v.

KERO LEASING CORPORATION,
a New Jersey Corporation;
ROBERT C. HOLMES, a proprietor,
individually, jointly and severally;
HOLMES LEASING COMPANY, a
proprietorship
(D.C. Civil No. 98-cv-1476)

ROBERT C. HOLMES

v.

BOARD OF TRUSTEES OF
TRUCKING EMPLOYEES OF
NORTH JERSEY WELFARE
FUND, INC.-PENSION FUND
(D.C. Civil No. 02-cv-0059)

BOARD OF TRUSTEES OF
TRUCKING EMPLOYEES
OF NORTH JERSEY, WELFARE
FUND, INC.-PENSION FUND,
Appellant Nos. 03-2176
and 03-3283

BOARD OF TRUSTEES OF
TRUCKING EMPLOYEES OF
NORTH JERSEY WELFARE FUND,
INC-PENSION FUND

v.

KERO LEASING CORPORATION,
a New Jersey Corporation;
ROBERT C. HOLMES, a proprietor,
individually, jointly and severally;
HOLMES LEASING COMPANY, a
proprietorship
(D.C. Civil No. 98-cv-1476)

ROBERT C. HOLMES

v.

BOARD OF TRUSTEES OF
TRUCKING EMPLOYEES OF
NORTH JERSEY WELFARE FUND,
INC.-PENSION FUND
(D.C. Civil No. 02-cv-0059)

ROBERT C. HOLMES,
Appellant Nos. 03-2344
and 03-3448

_____

Appeals from the United States
District Court for the
District of New Jersey
(D.C. Civil Nos. 98-cv-1476
and 02-cv-0059)
District Judge:
Honorable Joseph A. Greenaway, Jr.

_____

Argued February 24, 2004

Before: RENDELL, BARRY and
ROSENN, Circuit Judges.

(Filed    July 12, 2004    )

Elizabeth Roberto    (ARGUED)
Roberto Law Offices
811 Fitzwater Street
Philadelphia, PA  19147
David W. New
Herbert New & David New
300 Broadacres Drive, 3rd Floor
Bloomfield, NJ  07033
  *Counsel for Appellant/Cross Appellee*

Arthur G. Telegen    (ARGUED)
Robert A. Fisher
Foley Hoag
155 Seaport Boulevard
Boston, MA  02210
  *Counsel for Appellee/Cross Appellant*

OPINION OF THE COURT

RENDELL, Circuit Judge.

In these appeals we are called upon to determine the relevant statute of limitations for an action brought by the trustees of a pension fund to recover withdrawal liability. The appellee, Robert Holmes, is the former sole shareholder of a company that ceased making payments to the plan, and the former sole proprietor of another related company. The District Court held that the action instituted by the pension fund against Holmes was untimely, as the complaint was filed seven years after the cause of action accrued, one year beyond the statute of limitations set forth in the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1461. For the reasons set forth below, we will affirm in part and reverse in part.

I.

The appellant, Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. – Pension Fund ("the Fund"), is the plan sponsor of a multiemployer fund established under the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. §§ 1002(37), 1301(3). Employers participating in the Fund's pension plan made contributions to the Fund based on terms set forth in collective bargaining agreements they negotiated with their employees.

Holmes was once the chief executive officer of a trucking company called Holmes Transportation Inc. ("HTI"). During the 1980s, Holmes created wholly-owned subsidiary companies to supply employees, equipment, and land to HTI. One of these companies was Holmes Leasing Company ("Holmes Leasing"), a sole proprietorship that owned and leased equipment to HTI. Another was Kero Leasing Corporation ("Kero"), a New Jersey corporation that provided employees to work at a certain HTI terminal. Holmes was the sole

2

proprietor of Holmes Leasing and the sole shareholder of Kero. Kero entered into a collective bargaining agreement with the union representing its workers.[1] The agreement required Kero to make contributions on behalf of its employees to the Fund's pension plan.

In March of 1987, Holmes agreed to sell HTI to Route Resources, a Canadian-owned holding company. The sale was consummated in September of 1988, and Kero's stock was included in the sale along with all interests in Holmes's sole proprietorships. In December of 1988, after Route Resources had assumed ownership and control of his businesses, Holmes retired to Florida. According to the Fund's complaint in this action, Kero stopped making contributions to the Fund in December of 1989, prior to the expiration of its duties under the collective bargaining agreement.[2] As a result, an

assessment for withdrawal liability was mandatory under the provisions of the MPPAA. See 29 U.S.C. § 1381. On February 27, 1990, upon realizing that Kero had withdrawn from the plan, the Fund sent a notice of the statutory assessment of withdrawal liability to Kero.

On March 7, 1991, after no payments were made by Kero, the Fund sent a letter to Route Resources regarding the default in payments, and the withdrawal liability was demanded in full. When Kero continued to default on its withdrawal liability payments, the Fund filed a complaint in the United States District Court for the District of New Jersey against Route Resources, alleging that it was under common control with Kero at the time of its withdrawal and was therefore responsible for the liability. No answer was filed, and on December 13, 1995, a default judgment was entered against Route Resources.

Notwithstanding its success in obtaining the default judgment, the Fund continued to be unable to collect any of the withdrawal liability. On January 8, 1998, counsel for the Fund sent a letter to Holmes asking him to appear for a deposition, to provide information about Route Resources, Kero, and any other

---

[1]Holmes initially signed the agreement himself, since the agreement was formed just prior to Kero's incorporation. Once Kero was incorporated in October of 1985, Holmes assigned the collective bargaining agreement, and the duty to contribute to the Fund, to the corporation.

[2]The District Court made no specific finding with respect to this fact, noting that it was disputed by the parties and that the withdrawal occurred sometime during this sale or a subsequent sale of the businesses by Route Resources. We rely on the time of withdrawal asserted in the complaint for purposes of describing the factual setting.

---

However, our analysis is not impacted by the choice of a specific date, as Holmes had indisputably severed his ties to his companies at the time the relevant notices were sent and the complaints were filed.

related corporations that might be responsible for the withdrawal liability. The letter also specified the amount that Kero owed and noted that a default judgment had been entered against Route Resources. However, the letter did not contain any indication that the Fund would seek to impose liability on Holmes personally. Meanwhile, the Fund instituted the instant action by filing a complaint in the District of New Jersey on March 31, 1998, naming Kero, Holmes Leasing, and Holmes personally as defendants. After his deposition on July 22, 1998, Holmes received a copy of the complaint in this matter from the Fund's counsel. According to Holmes, this was his first notice that the Fund was seeking to collect the withdrawal liability from him.

## II.

The Fund's complaint in the instant case demands judgment against all three named defendants, including Holmes personally, in the amount of the withdrawal liability, plus interest, attorneys' fees, and costs. Holmes was the only defendant to answer the complaint, and he is the only appellee to file a brief in this appeal. Initially, both the Fund and Holmes filed motions for summary judgment on the merits. The District Court denied both motions and referred the matter to arbitration in accordance with the MPPAA, 29 U.S.C. § 1401. The Court also ordered Holmes to make interim withdrawal liability payments to the Fund while the arbitration was pending. See 29 U.S.C. § 1399(c)(2); Bd. of Trs. of Trucking Employees of N. Jersey Welfare Fund, Inc. – Pension Fund v. Centra, 983 F.2d 495, 507 (3d Cir. 1992).

During arbitration, Holmes argued, inter alia, that the Fund failed to provide notice of its intention to seek the withdrawal liability from Holmes personally "as soon as practicable" after Kero's withdrawal, as required by 29 U.S.C. § 1399(b)(1), and should therefore be barred from assessing the withdrawal penalty against him. In December of 2001, the arbitrator issued an opinion agreeing with Holmes and dismissing the Fund's claim for withdrawal liability.[3]

---

[3]The dissent implies that the Fund and its attorneys acted diligently from the time the withdrawal liability accrued, and that they were constantly engaged in good faith attempts to track down "Kero's phantom owners." Dissent at 8. However, the arbitrator's findings, which were based on information that came to light during discovery associated with those proceedings, indicate that the Fund knew or should have known of Holmes's connection to Kero, its sale, and the withdrawal liability in the early 1990s. In other words, the six year limitations period created by Congress in the MPPAA did provide enough time for the Fund to learn of potential controlled group members. The Fund had the option of pursuing Holmes personally several years earlier than it did, and well within the statute of limitations, but it simply chose not to do

4

While the arbitration was proceeding, the Fund appealed the District Court's order denying summary judgment and referring the matter to arbitration. Holmes cross-appealed and moved to reopen the record to explore whether the six year statute of limitations under the MPPAA had expired, based on the fact that, during discovery related to the arbitration, he became aware for the first time that the Fund had sent a letter in March of 1991 accelerating the withdrawal liability. Accordingly, he urged that the action commenced in 1998 should be dismissed as untimely.

Another panel of our court considered these appeals and remanded the matter in September of 2001, directing the District Court to determine whether the statute of limitations had expired prior to the filing of the 1998 action. The District Court reopened the record, and the parties filed another round of motions for summary judgment. The Court ultimately granted summary judgment in favor of Holmes on April 22, 2003, and ordered the Fund to reimburse him in an amount equal to the interim payments, interest, attorneys' fees and costs Holmes had already paid to the Fund as required by the MPPAA, as well as interest on those payments. The Court first determined that the cause of action accrued with the sending of the March 1991 letter. See Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferber Corp. of Cal., Inc., 522 U.S. 192, 194 (1997) (holding that a

new statute of limitations starts to run with each missed payment or when payment of the debt is accelerated). Strictly applying the six year statute of limitations in this case, the Court then concluded that the limitations period expired in 1997, and that the action was brought approximately one year too late.

The Fund urged the Court to characterize the 1998 action as an enforcement, as against Holmes, of the 1995 default judgment that had been entered against Route Resources. The Court rejected this theory, adopting reasoning similar to that employed in Central States, Southeast & Southwest Areas Pension Fund v. Mississippi Warehouse Corp., 853 F. Supp. 1053 (N.D. Ill. 1994), and distinguishing controlled group liability under the MPPAA from other alter-ego theories of liability. In doing so, the Court declined to follow the lead of certain other New Jersey district courts that had permitted actions brought after the six year limitations period to proceed by characterizing them as enforcement actions against persons who were not previously named, but who were admittedly controlled group members with the defendants that had been named. The Court emphasized that Holmes had sold his interests in the entities in 1988 – before the liability arose and before notice of it was given – and that he continued to dispute his status as a member of the controlled group with Kero. Cf. Bd. of Trs. of Trucking Employees of N. Jersey Welfare Fund, Inc. v. Gotham Fuel Corp., 860 F. Supp. 1044 (D.N.J. 1993) (applying

---

so.

5

New Jersey's twenty year statute of limitations for enforcing judgments to an action seeking to enforce a default judgment, where defendants were not parties to the earlier action but did not dispute their status as members of the relevant controlled group); Bd. of Trs. of Trucking Employees of N. Jersey Welfare Fund, Inc. v. Able Truck Rental Corp., 822 F. Supp. 1091 (D.N.J. 1993) (same).

Ultimately, the District Court held that any action by the Fund seeking to hold a potential controlled group member like Holmes jointly and severally liable for the withdrawal assessment had to be brought within the MPPAA's six year statute of limitations. Thus, the Fund's action was dismissed with prejudice, and the Fund was ordered to return all payments made by Holmes, with interest.[4] The Fund appealed this order, and Holmes cross-appealed. The District Court also issued a Judgment ordering that the payments made by Holmes were to be reimbursed. The

---

[4]The District Court also vacated the arbitrator's opinion without discussing the merits of the determinations made by the arbitrator, as the statute of limitations mandated dismissal and rendered the arbitration moot. Thus, the District Court did not discuss whether Holmes received notice "as soon as practicable," nor shall we. Such an inquiry would only become relevant after a finding that the action was filed within the six year limitations period, and that further issues governed by the MPPAA could be explored.

Fund appealed certain aspects of the Judgment, and Holmes cross-appealed once more. Before us now are both sets of appeals and cross-appeals, which have been consolidated for our review.

III.

This action was brought under ERISA and the MPPAA. The District Court had jurisdiction over it pursuant to 29 U.S.C. § 1451(c). We review the District Court's final order granting summary judgment in favor of Holmes based on 28 U.S.C. § 1291. Because the issues involved are purely legal, we exercise plenary review of the District Court's grant of summary judgment, its interpretation of the MPPAA's statute of limitations provision, and its award of damages in light of ERISA's anti-inurement provision. IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 122 (3d Cir. 1986). However, where the relevant statutes are silent or ambiguous, we will defer to any reasonable regulations promulgated by the Department of Labor in connection with the statutory provisions at issue in this case. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).

IV.

In their various briefs, the parties raise numerous issues related to the proper application of the statute of limitations to this action, the merits of the District Court's first opinion ordering arbitration,

6

the enforcement of the arbitrator's order, and the amount of reimbursement included in the District Court's final judgment. We will not reach many of these issues, as we will affirm the District Court's determination related to the MPPAA's statute of limitations. In light of our conclusion that the action was untimely, the only other issues that require our attention are those related to the calculation of the Fund's reimbursement to Holmes. We will discuss both of the pertinent issues – the statute of limitations, and the judgment amount – in turn.

## A.

We first consider what the applicable statute of limitations is in the context of the Fund's action as it is stated in the 1998 complaint. Under the MPPAA, when an employer prematurely ceases making payments into a pension plan, the trustees of the plan can assess the withdrawal liability against the withdrawing employer in an amount representing that employer's pro rata share of the payments remaining due to the pension fund.[5]  29 U.S.C. § 1381(b)(1).

[5]In disputes that arise under the MPPAA, the following sequence of events normally occurs. First, the trustees of the plan determine that an employer has withdrawn within the meaning of the MPPAA. 29 U.S.C. §§ 1382(1), 1399(b)(1)(A)(I). The trustees then notify the employer of its liability, demand payment, and offer an amortization

The MPPAA extends responsibility for

schedule. Id. at §§ 1382(2), 1382(3), 1399(b)(1)(B). The employer then has ninety days to request that the trustees conduct a reasonable review of the amount of liability. Id. at § 1399(b)(2)(A)(I). If the dispute is not resolved at that time, either party may initiate arbitration within the relevant time period set forth in § 1401(a)(1). An employer will waive its statutory rights to dispute aspects of the Fund's liability determination where arbitration is not demanded within the time period prescribed by the statute. Barker & Williamson, 788 F.2d at 129. During arbitration, determinations made by the Fund regarding withdrawal liability amounts or classification of an employer as a responsible party are entitled to a presumption of correctness, unless the employer shows by a preponderance of the evidence that the determinations are unreasonable or clearly erroneous. Id. at § 1401(a)(3)(A).

Regardless of requests for review or arbitration, an employer must begin making interim payments of the withdrawal liability, following the schedule set forth by the trustees, within sixty days of receiving the initial notice of liability. Id. at §§ 1399(c)(2), 1401(d); see Galgay v. Beaverbrook Coal Co., 105 F.3d 137, 139 (3d Cir. 1997). When the arbitration concludes, either party may bring an action in federal district court "to enforce, vacate or modify the arbitrator's award." Id. at § 1401(b)(2).

payment of withdrawal liability beyond the withdrawing employer to "all employees of trades or businesses (whether or not incorporated) which are under common control." 29 U.S.C. § 1301(b)(1). In this case, the Fund seeks to use this provision in order to hold Holmes liable for Kero's withdrawal liability, as he was once the CEO of one business under common control with Kero, and sole proprietor of another.

In setting forth the parameters for civil actions brought under the MPPAA, Congress imposed a specific statute of limitations that governs actions to recover withdrawal liability. According to § 1451(f)(1) of the statutory scheme, the Fund's MPPAA action must have been brought within "6 years after the date on which the cause of action arose," in order for it to be considered timely.[6] According to the Supreme Court, a cause of action for withdrawal liability arises under the MPPAA each time an employer fails to make a payment as scheduled by the plan trustees, and the trustees have no obligation to accelerate the debt when an employer defaults. Bay Area, 522 U.S. at 194-95. However, in a case where the trustees elect to accelerate the liability by demanding payment in full following an employer's default, which is permissible under 29 U.S.C. § 1399(c)(5), the six year period begins to run when the liability is accelerated. See id. at 209 n.5 ("The statute of limitations on an accelerated debt runs from the date the creditor exercises its acceleration option . . . ."); see also Bd. of Trs. of Dist. No. 15 Machinists' Pension Fund v. Kahle Eng'g Corp., 43 F.3d 852, 857 (3d Cir. 1994) (discussing the application of a statute of limitations to a debt payable in installments).

The parties here apparently do not dispute the fact that the letter sent to Kero by the Fund in March of 1991 accelerated the liability by demanding payment in full. Thus, the District Court correctly identified the date of that letter as the event that marked the starting point for the six year statute of limitations according to the Supreme Court's discussion in Bay Area. In light of that fact, the period for bringing actions under the MPPAA to recover Kero's withdrawal liability ended in March of 1997, one full year prior to the filing of the instant complaint. Without looking any further, it appears as though a straightforward application of the six year limitations period leads to the conclusion that the Fund's action here was untimely.

---

[6]The statute provides an alternative time limitation, which allows an action to be brought within "3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action." 29 U.S.C. § 1451(f)(2). The provision indicates that the longer of the two limitation periods described should apply. Here, the Fund has never argued that the alternative period should apply to save its claims, so we will only consider the six year limitations period described in the first paragraph of subsection (f).

However, the Fund seeks to avoid that conclusion by characterizing the instant action as one to enforce the 1995 default judgment it obtained against Route Resources, and not as an original action under the MPPAA to impose withdrawal liability against Holmes. The MPPAA does not contain a separate provision for enforcement of judgments. Presumably, therefore, the enforcement of the judgment would be a matter of state law, here carrying a twenty year statute of limitations, so the Fund urges that the action was timely.

However, the Fund's 1998 complaint very clearly states an original action to recover withdrawal liability under the MPPAA, not one to enforce a judgment. Like the complaint filed in 1995 against Route Resources, the first paragraph of the 1998 complaint explicitly describes the case as "an action for collection of withdrawal liability under the [MPPAA]." In fact, the complaint is replete with statements indicating that the action was brought to collect withdrawal liability from Holmes directly under the MPPAA. For example, paragraph 32 states that "Defendants have failed to make any of the monthly payments of the withdrawal liability assessment; thus, it is necessary to bring this action to enforce payment." Paragraphs 33 and 34 go on to describe original actions brought under the MPPAA, 29 U.S.C. § 1451(b), to "enforce payment of a withdrawal liability assessment." Further, the complaint indicates in paragraph 17 that the amount of the 1995 default judgment was $3,670,093.70, but proceeds to demand a judgment against Holmes in a different amount, listing payments that would be sought in an original action under the MPPAA.

Only two paragraphs of the 1998 complaint even mention the 1995 default judgment, and nothing related to that judgment is referenced, either explicitly or implicitly, in the Fund's prayer for relief. Thus, the most obvious reading of the complaint – and, we think, the only plausible reading – leads us to conclude that it states an original action brought under the MPPAA, rather than one to enforce the 1995 judgment.[7]

## B.

Notwithstanding the manner in which the complaint is framed, the Fund

[7]Indeed, even if we were to adopt the dissent's position and hold that a pension fund may only bring one original action under the MPPAA to fix withdrawal liability and must thereafter seek to enforce the one judgment obtained in that action, rather than to assert new original actions, we would conclude that the Fund has not done so here. In other words, if the correct course of action for the Fund to take was to seek enforcement of the 1995 default judgment, we would remain convinced that the Fund's failure to articulate such a cause of action in its 1998 complaint precludes it from prevailing on this appeal.

9

urges us to view the complaint differently based on the following argument. The Fund's initial notice of the withdrawal liability, sent in 1990, constituted constructive notice to all businesses or persons that were ever under common control with Kero. See Barker & Williamson, 788 F.2d at 127 (holding that actual notice to an employer serves as constructive notice to all other members of a controlled group). The Fund relies on this principle for the further proposition that a judgment obtained against one member of a controlled group is a judgment against all other members. In other words, the Fund asserts that a timely filed suit to recover withdrawal liability that results in default judgment against one entity determines the liability of all other controlled group members, whether or not they are named as parties to the action. Thus, this principle would allow the Fund to enforce the 1995 default judgment obtained against certain members of Kero's controlled group against any other entity they deem to be an additional member of that controlled group, including Holmes.

Because it characterizes this action as one to enforce a prior judgment, the Fund urges that it should be governed by New Jersey's twenty year statute of limitations for enforcement of judgments, N.J. Stat. Ann. § 2A:14-5, rather than by the MPPAA's six year limitations period. The Fund finds support for this view in two cases decided by New Jersey district courts, both of which applied the twenty year limitations period to actions seeking to enforce prior default judgments for withdrawal liability under the MPPAA. See Gotham Fuel, 860 F. Supp. at 1050 (holding that the state limitations period for enforcement of judgments applies once a fund establishes that the defendants were part of the relevant single employer group); Able Truck, 822 F. Supp. at 1095 (same).

We conclude that the Fund's position regarding the statute of limitations is flawed. Initially, we emphasize our conclusion, explained fully above, that the complaint as written simply does not lend itself to such a reading. The second amended complaint in this matter, which was nearly identical to the Fund's earlier complaint that resulted in the 1995 default judgment, explicitly seeks to collect withdrawal liability from Holmes. Such an action is governed by the MPPAA's six year limitations period. We would find it difficult to read the 1998 complaint as setting forth an action to enforce a prior judgment without disregarding the clear language of the complaint and engaging in illogical contortions.[8] But even if we

---

[8]Additionally, adopting the Fund's alternative description of this action as one to enforce the default judgment would require us to ignore the character of the proceedings as they were conducted during the first three or four years of this litigation. Prior to our remand instructing the District Court to examine the statute of limitations issue, the proceedings in the District Court and before the arbitrator

chose to reinterpret the complaint as the Fund suggests, we still think the action is barred, and that the application of a twenty year statute for enforcement of judgments is problematic here. This is so for several basic reasons.

First, the Fund acknowledges the fact that it has not obtained a default judgment against Holmes personally. Additionally, the District Court refused to find that Holmes was notified of the withdrawal liability prior to 1998. The Fund, therefore, must engage in the difficult task of convincing us that Holmes is somehow liable when he was not notified of the claim in a timely manner; further, it must persuade us that Holmes is somehow bound by a judgment in an action of which he had no actual notice, in

---

were structured as they would be in an original action brought under the MPPAA. The arguments made by the Fund in its first motion for summary judgment and before the arbitrator never indicated a desire to simply enforce the 1995 judgment. For example, the Fund argued in its first summary judgment motion that Holmes could not dispute the amount of the withdrawal liability because he failed to request arbitration in a timely manner, and not because he was already bound by an existing judgment. The Fund's conduct throughout the early stages of this litigation reaffirms our reading of the complaint as stating an original action under the MPPAA, rather than an action to enforce a prior judgment.

which he was not a named party, and in which no one actively represented his interests.

In attempting to accomplish this feat, the Fund relies heavily on our discussion in Barker & Williamson. There, we were asked to decide whether a company, Sentinel Electronics, was in a controlled group with the withdrawing company, Barker & Williamson, and if so, whether notice to Barker & Williamson constituted constructive notice to Sentinel. 788 F.2d at 121. We first determined that Sentinel and Barker & Williamson had become members of the same controlled group prior to the pension plan withdrawal that gave rise to the action. Id. at 122-26. After deciding that the two companies were a "single employer" within the meaning of the MPPAA, we held that actual notice of the withdrawal liability to Barker & Williamson constituted constructive notice to all other members of its controlled group, including Sentinel. Id. at 126-30. Thus, like other courts of appeals, we adopted a "notice to one is notice to all" rule to be applied in MPPAA cases. Id. at 127; see also, e.g., Cent. States, Southeast & Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1375 (7th Cir. 1992); I.A.M. Nat'l Pension Fund, Plan A, A Benefits v. Slyman Indus., Inc., 901 F.2d 127, 129 (D.C. Cir. 1990); Teamsters Pension Trust Fund – Bd. of Trs. of W. Conference v. Allyn Transp. Co., 832 F.2d 502, 506-07 (9th Cir. 1987).

However, the principle of "notice to one is notice to all" announced in <u>Barker & Williamson</u> does not lead to the conclusion suggested by the Fund regarding enforcement of default judgments. In <u>Barker & Williamson</u>, there was no statute of limitations issue before us, because the pension fund had brought timely actions under the MPPAA against both the employer and the potential members of the controlled group. The relevant parties were all joined in the initial litigation, so the fund was not attempting to enforce any prior judgment, and the limitations period for arbitrating disputes under the MPPAA had not yet run. Also, the issue there involved whether the defendant company had <u>become</u> a member of the controlled group prior to the employer's withdrawal, rather than whether the defendant had <u>terminated</u> its membership in the controlled group prior to the withdrawal. Therefore, no question was presented that required arbitration under the MPPAA; all issues could be decided by the court on its own. <u>See</u> <u>Galgay v. Beaverbrook Coal Co.</u>, 105 F.3d 137, 141-42 (3d Cir. 1997); <u>see also</u> <u>Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia</u>, 830 F.2d 1241, 1249-50 (3d Cir. 1987) (distinguishing <u>Barker & Williamson</u> from a case in which the issue involved termination of controlled group status).

In <u>Barker & Williamson</u>, we determined that, at the time of the withdrawal, Barker & Williamson and Sentinel were "brother-sister corporations" under the Internal Revenue Code standards incorporated by the MPPAA for determining controlled group status. 788 F.2d at 123; <u>see</u> 29 U.S.C. § 1301(b)(1). Here, Holmes had divested himself of his interests in his former businesses and retired to Florida in 1988, so it is far from certain that such a "brother-sister" relationship could be imputed to Holmes and Kero at the time of the withdrawal.[9] Further, without first determining whether Holmes was in fact a member of the controlled group at the time of the withdrawal, as we did in <u>Barker & Williamson</u>, we would be hesitant to apply the "notice to one is notice to all" rule on the facts of this case, let alone expand the rule to support a finding that a default judgment obtained in 1995 is enforceable against Holmes.[10]

---

[9]We note that it would be even more of a stretch to find a "brother-sister" relationship between Holmes and Route Resources, the company against whom the 1995 default judgment was entered. It appears as though Holmes passed his ties to Kero along to Route Resources in the sale of his companies, so any controlled group connection between Holmes and Route Resources would be fairly attenuated.

[10]The Fund has not pointed us to a case, and we are not aware of any, in which we have applied <u>Barker & Williamson</u>'s constructive notice concept to a situation where an employer had severed all ties to the controlled group entities before the trustees sent notice of the liability. Under the cases we have examined, application of

12

In an effort to provide further support for its proposed rule, the Fund directs our attention to two cases decided by district courts in New Jersey. In those cases, the lower courts extended our reasoning in Barker & Williamson to create a "judgment against one is judgment against all" rule that they applied to MPPAA controlled group situations where a pension fund sought to enforce a prior

the "notice to one is notice to all" concept is only proper after there has been a determination regarding membership in the controlled group. See Barker & Williamson, 788 F.2d at 126-27 (developing the rule regarding notice after first concluding that the relevant parties were controlled group members); see also Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 175 (3d Cir. 2002) (applying the notice rule after establishing alter ego status and likening the situation presented to a controlled group); Trs. of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc., 862 F.2d 1020, 1024 (3d Cir. 1988) (applying the notice rule after noting that the district court finding regarding controlled group status was not appealed); Trs. of Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Rentar Indus., Inc., 1989 WL 153559, at *4 (N.D. Ill. Nov. 8, 1989) ("[O]wners who sell a business cannot be expected to know of withdrawal liability assessments which are served on their successors after control has been transferred.").

judgment against a newly-located member of the controlled group within the state statute of limitations for enforcement of judgments.[11] Gotham Fuel, 860 F. Supp. at 1050; Able Truck, 822 F. Supp. at 1095. However, several factors counsel against reliance on the New Jersey district court cases cited by the Fund. Obviously, we are not bound by the manner in which the New Jersey district courts have interpreted the MPPAA and our relevant precedent. Furthermore, whereas the courts in Able Truck and Gotham Fuel indicated that the actions before them were characterized as actions to enforce prior default judgments,

[11]Other district courts facing facts similar to those presented here have refused to apply a statute of limitations other than the one described in the MPPAA. See Mississippi Warehouse, 853 F. Supp. at 1059 ("[E]ach action brought against an alleged controlled group member on the basis of joint and several liability must be brought within the ERISA limitations period . . . . [A fund] may not invoke ERISA withdrawal provisions while simultaneously appealing to a state statute of limitations for the collection of a judgment."); see also Langone v. Esernia, 847 F. Supp. 214, 218-19 (D. Mass. 1994) (considering a complaint seeking to bring an original MPPAA action and to enforce a prior judgment, and granting summary judgment in favor of defendant sole proprietor based on statute of limitations and failure to show why the court should pierce the corporate veil and hold proprietor responsible for liability).

applying such a view in this case would require us to substantially recharacterize the action originally set forth in the Fund's complaint, as we explained above. We are simply unwilling to do so. Finally, a key distinction separates the facts before us from those at issue in Able Truck and Gotham Fuel and convinces us that the Fund is time-barred from proceeding with this action. The defendants in both of the New Jersey district court cases conceded membership in the relevant controlled groups, leaving no unresolved issues that would require arbitration pursuant to the MPPAA. Thus, those courts were able to apply the state enforcement statutes of limitations without implicating other MPPAA provisions that would require resolution through arbitration. Indeed, those district courts emphasized this fact as they reached their conclusions extending the liability determined in prior judgments to the new parties before them. See Gotham Fuel, 860 F. Supp. at 1048 ("It is conceded that defendants . . . were, as of the date of the withdrawal, members of a controlled group with the contributing employer . . . ."); Able Truck, 822 F. Supp. at 1093-94 ("Defendants do not deny that [they] were members of a controlled group with [the withdrawing company at the relevant time]. Thus, the only contested issue is whether plaintiff's action is timely.").

Here, Holmes cites the sale of his interests in all of his businesses and his retirement to Florida, and vigorously objects to any claim that he should be deemed a controlled group member at the time of the withdrawal, leaving us faced with a dispute that would require arbitration as dictated by the MPPAA, including its statute of limitations provision.[12] Thus, we think that the ultimate problem with the Fund's position is the fact that there has been no finding here by any court or arbitrator that Holmes was an employer or a member of the controlled group within the meaning of the MPPAA at the time Kero withdrew from the Fund. We conclude that such a finding would be a necessary predicate to our even considering the application of the Barker & Williamson rule, and to any proposed

---

[12]Because the facts of the New Jersey district court cases are distinguishable on this basis, we need not decide whether the "judgment against one is judgment against all" concept adopted by the New Jersey courts is more generally proper under the MPPAA, or whether the MPPAA allows for "enforcement" actions to be brought in federal court at all. Cf. Peacock v. Thomas, 516 U.S. 349 (1996) (concluding that district courts lack jurisdiction over an action seeking to enforce, as against a corporation's officer, a judgment obtained in a previous ERISA suit involving the corporation). While a statutory basis for importing state statutes of limitations governing enforcement of judgment actions does not seem apparent to us as we read the relevant provisions of the MPPAA, we will not engage in a lengthy examination and resolution of that issue here. The issue before us is narrower than that.

14

extension thereof. See supra note 10.

## C.

Hoping to avoid the need to obtain such a finding, the Fund seeks to have the 1995 judgment enforced against Holmes by asserting a challenge to the sale of Holmes's companies, saying that the purpose of that transaction was to evade withdrawal liability. So, under the MPPAA, since any transaction undertaken for the "principal purpose" of evading or avoiding withdrawal liability must be disregarded, Holmes's sale should be ignored. 29 U.S.C. § 1392(c). In other words, an employer might still be responsible for withdrawal liability, even after he sells his businesses, if the purpose of the sale is deemed to bring the transaction within the scope of § 1392(c). Here, the Fund urges that Holmes's sale of Kero and his other businesses to Route Resources, which occurred prior to Kero's withdrawal from the plan, should not shield him from liability. We are unconvinced by this theory as well.

According to the Fund, we must accept its assertion, stated for the first time in its 1998 complaint, that Holmes's sale of his companies to Route Resources was undertaken so that he could avoid withdrawal liability under the MPPAA. Based on that assertion and its theory that "judgment against one is judgment against all" under the MPPAA's controlled group provision, the Fund contends that we must disregard Holmes's sale, find that he was in the controlled group with Kero and is thereby responsible for the withdrawal liability, and allow the Fund to enforce the 1995 default judgment against Holmes.

It is true that, in an arbitration proceeding, a pension fund's finding that a defendant engaged in a transaction described in the "evade or avoid" provision of the MPPAA is accorded a presumption of correctness, which must be overcome by proof to the contrary offered by the defendant. See 29 U.S.C. § 1401(a)(3)(A). And the Fund is correct that a court may not evaluate whether a company, which has already been deemed to have been a member of the controlled group at one time prior to the withdrawal, has engaged in a transaction to evade liability.[13] See Flying Tiger, 830 F.2d at

---

[13]We have interpreted the MPPAA to require that "where the party against which withdrawal liability is being asserted was certainly part of the controlled group of an employer subject to the MPPAA at some point in time, and where the issues in dispute fall within the purview of MPPAA provisions that are explicitly designated for arbitration," the parties must comply with the MPPAA arbitration provisions in resolving their dispute. Flying Tiger, 830 F.2d at 1247. In other words, a federal district court may not, for example, make a determination as to whether a particular transaction was undertaken in order to evade or avoid withdrawal liability; rather, that issue is one that is explicitly reserved for resolution through arbitration. Id.; see also Galgay, 105 F.3d at 141. However, a

15

1247. However, this does not mean that we must allow a pension fund to bring a claim against a defendant, alleging for the first time that he engaged in a transaction with a purpose of evasion and is thus liable, after the six year limitations period under the MPPAA has expired. Neither does it imply that we must entertain such an action when a pension fund asserts it under the guise of enforcing a judgment, conclusive as to liability.

We are not persuaded that the MPPAA allows a pension fund, once it has obtained a default judgment within the six year period, to initiate a string of suits against purported members of a controlled group anytime in the following twenty year period. This strikes us as especially troublesome in view of the fact that, if permitted to avoid the MPPAA's statute of limitations here and force Holmes to litigate this matter beyond the statutory period, the Fund would have managed to do so by merely adding a simple paragraph to its complaint alleging that Holmes's sale of his businesses "was to evade or avoid withdrawal liability."[14] It is one thing to

allow collection of a judgment against those clearly liable, as the New Jersey district courts have done, but quite another to sanction an attempt to bypass the MPPAA's limitations provision and litigate issues related to withdrawal liability in such a belated action. We hold that an "evade or avoid" determination must be asserted, allowing for the necessary arbitration proceedings that would be governed entirely by provisions of the MPPAA, within the six year statute of limitations that governs proceedings involving the MPPAA. Thus, applying the plain language of the statutory provisions, the Fund is time-barred from raising and litigating the issue of whether Holmes's sale of his companies to Route Resources in 1988 was undertaken in order to evade or avoid Kero's withdrawal liability.

The dissent asserts that our ruling will vitiate the remedial purpose of the

---

district court may preliminarily determine whether the MPPAA applies at all to a given entity, and it may resolve other issues where arbitration would cause irreparable harm to the employer, or where the question is one of statutory interpretation. Flying Tiger, 830 F.2d at 1251-54; see also Galgay, 105 F.3d at 142

[14]Even if we would be required to accept the Fund's assertion and consider Holmes

---

a member of the controlled group until he refutes the Fund's "determination" in arbitration, we would still conclude that the Fund's action was untimely. As we have indicated above, the complaint that first announces the Fund's "determination" was filed beyond the six year statute of limitations. Further, the only method for challenging that "determination" is arbitration, as described by the MPPAA. Under these circumstances, we find no basis in either the statutory scheme or the case law interpreting it to apply a statute of limitations other than the one clearly delineated in the MPPAA itself.

16

MPPAA and do an injustice to pension funds seeking to enforce judgments related to delinquent withdrawal liability payments. But we do not view our opinion as doing either of those things. It is true, as we have previously observed, that the MPPAA sets up a single-employer, or controlled group, scheme because a fund "has no way of knowing the ownership of a closely held corporation." Barker & Williamson, 788 F.2d at 128. But we made that observation in the context of a case involving notice of withdrawal liability, which, under the MPPAA, must be given "as soon as practicable." 29 U.S.C. § 1399(b)(1). Thereafter, a pension fund has six full years to investigate and prepare to bring a cause of action to recover the withdrawal liability in a district court. 29 U.S.C. § 1451(f). Congress elected to create a relatively long limitations period to govern actions brought under the MPPAA, giving pension funds adequate time to locate corporations and persons who are potentially responsible for withdrawal liability. See Central States, Southeast & Southwest Areas Pension Fund v. Navco, 3 F.3d 167, 171 (7th Cir. 1993), abrogated on other grounds by Bay Area, 522 U.S. at 194.

On the other hand, the MPPAA is a remedial statutory scheme which is to be "liberally construed in favor of protecting the participants in employee benefit plans." Id. at 127. The discrete six year limitations period furthers this goal, requiring a fund to act expeditiously in pursuing payment from members of a controlled group, rather than allowing such

claims to languish over a twenty year limitations period.[15] Accordingly, Congress has given funds sufficient time to discover the owners of closely held corporations and trace the paths of complicated sales transactions, while at the same time encouraging funds to act in a manner that serves the best interests of the plan participants.

V.

Because we agree with the District Court that this matter should have been dismissed as untimely, Holmes is entitled to a reimbursement of the interim payments he made while the action was pending. See 29 C.F.R. § 4219.31(d) (requiring a plan sponsor to refund overpayments of withdrawal liability). The Fund does not dispute the fact that, given our conclusion regarding the statute of limitations, it is required to return some portion of Holmes's payments. However, the Fund does assert that the return of certain amounts described in the District

_____

[15]We see it fit to emphasize here that we are to construe this remedial scheme in favor of the plan participants. This does not always equate to construing the scheme in a way that grants wide latitude to the pension funds. Here, it is in the best interests of the plan participants to allow sufficient time for a fund to engage in the necessary investigation related to identifying potentially liable entities, but to also motivate the fund to do so in an expeditious manner.

17

Court's judgment would violate ERISA's anti-inurement provision. See 29 U.S.C. § 1103(c) (preventing plan assets from inuring to the benefit of an employer). Specifically, the Fund asserts that it should only be required to return the interim payments made by Holmes – the return of which is explicitly provided for in an exception to the anti-inurement provision of ERISA, see 29 U.S.C. § 1103(c)(3) – without having to return his payments of attorneys' fees and costs, and without having to pay interest on the total amount.

## A.

We agree with the Fund that it should be permitted to retain the payments of attorneys' fees and costs. A few more facts are necessary here in order to understand the context in which these payments were made, as well as our decision to allow the Fund to keep them. In the District Court's first order referring this matter to arbitration, the Court ordered Holmes to begin making interim withdrawal liability payments to the Fund in accordance with 29 U.S.C. § 1399(c)(2). Following this decision, Holmes refused to make the interim payments that had come due between the date that he received the complaint and the date that the Court ordered him to make the payments. The Fund filed a Motion for Entry of Judgment, seeking the overdue payments, and Holmes filed a Motion for Clarification, asking whether the Court's order mandated the backpayments. After determining that its order had been clear and that Holmes was responsible for

making the overdue payments, the Court entered judgment for the delinquent payments and ordered Holmes to pay any attorneys' fees and costs associated with the Fund's efforts to secure payment pursuant to the original order.

In its final order related to this matter, after dismissing the Fund's action based on the statute of limitations, the District Court included these attorneys' fees and costs paid by Holmes in the total amount the Fund was ordered to return to him. The Fund offers two reasons explaining why it thinks the District Court erred, and why it should not have to return that portion of the total amount: first, the Fund notes that the payment arose from Holmes's failure to comply with a court order; and second, the Fund urges that the payments are now plan assets, which cannot be returned absent a specific statutory exception to the anti-inurement provisions of ERISA. We agree that, for the first reason offered by the Fund, Holmes is not entitled to reimbursement of these costs and fees.

Regardless of the ultimate disposition of the case, Holmes had an obligation to comply with the District Court's orders that preceded its final judgment. By refusing to obey the initial order regarding interim payments, Holmes forced the Fund to engage in further litigation in order to secure enforcement of what was at the time a valid order of the District Court. The subsequent determination regarding the untimeliness of the Fund's action does not serve to

18

negate the costs incurred due to Holmes's wrongful failure to make the interim payments ordered by the Court. Thus, we will reverse the District Court's judgment insofar as it orders the Fund to reimburse Holmes for the payments of these attorneys' fees and costs.[16]

### B.

The second issue related to the reimbursement amount involves the District Court's award of interest and its use of the interest rate set forth in the Fund's plan agreement as the interest rate applicable to delinquent contributions and payments. The Fund contends that it should not be required to pay interest on the amount of the reimbursement, and, in the alternative, that the interest rate should be based on prevailing market rates. We reject both of these arguments. As to the Fund's obligation to pay interest, we are bound by a prior decision of our court. See Huber v. Casablanca Indus., Inc., 916 F.2d 85, 103 (3d Cir. 1990) (holding that an ERISA fund may be required to pay interest on refunds of withdrawal liability

---

[16]Because we are persuaded by the Fund's first point, we need not determine whether ERISA's anti-inurement provision, viewed in light of other provisions of the MPPAA related to withdrawal liability refunds, would bar the return of previously paid attorneys' fees and costs here.

overpayments).[17] In Huber, we examined a regulation promulgated by the Department of Labor allowing for the payment of interest on overpayments under the MPPAA, and we deferred to the agency's reasonable construction of the MPPAA and the anti-inurement provision of ERISA.[18] See 29 C.F.R. § 4219.31(d)

---

[17]We note that Huber was partially abrogated, with respect to a separate holding not relevant here, by the Supreme Court's decision in Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414, 421 (1995).

[18]The Fund urges that Huber's analysis on this point has been undermined by intervening developments in this area of the law. Specifically, the Fund asserts that our discussion in Huber rested upon our holding in an earlier case that was subsequently abrogated by a decision of the Supreme Court. See United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d 128 (3d Cir. 1986), abrogated in part by, Concrete Pipe & Prods. of Cal, Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602 (1993) (involving the constitutionality of the MPPAA's presumptions favoring liability determinations made by multiemployer plans). We are not persuaded that our conclusion in Huber regarding payment of interest was dealt a fatal blow by the Supreme Court's decision in Concrete Pipe, as it is far from clear that our holding on this point was dictated solely by our mention of United

("The plan sponsor shall credit interest on the overpayment from the date of the overpayment to the date on which the overpayment is refunded . . . ."); see also Chevron, 467 U.S. at 844. In light of this binding precedent, the District Court was correct to include an award of interest in its judgment order outlining the amount of Holmes's reimbursement.

Regarding the interest rate to be applied when a fund reimburses an employer for overpayments of withdrawal liability, we again look to the Department of Labor's regulation for guidance. According to 29 C.F.R. § 4219.31(d), the Fund must credit interest on the overpayment "at the same rate as the rate for overdue withdrawal liability payments." In determining what rate should apply, the Fund may choose between the rate specified in 29 C.F.R. § 4219.32, which sets out a rate that is essentially equivalent to the prevailing market rate for short-term commercial loans, or the rate specified by the plan itself pursuant to 29 C.F.R. § 4219.33, which allows ERISA funds to adopt reasonable rules setting out interests rates that will apply to overdue or overpaid withdrawal liability. Here, the Fund's plan agreement sets the interest rate for overdue withdrawal liability at ten percent, and the Court applied that rate in constructing its judgment order. We see no basis for questioning that determination. While the rate set by the Fund might be slightly higher than the current prevailing market rate, the average rates over time have been recorded both above and below ten percent. Further, we note that it seems somewhat problematic for the Fund to be challenging its own rate as being unreasonable, while it presumably continues to apply that rate against employers with delinquent plan contributions and overdue withdrawal liability payments. In any event, we conclude that the District Court's award of interest at a rate of ten percent was proper.

VI.

Accordingly, we will AFFIRM the order of the District Court granting summary judgment in favor of Holmes and dismissing the Fund's action as untimely. We will also AFFIRM the judgment of the District Court to the extent that it orders the Fund to reimburse Holmes in the amount of his interim payments, the interest he paid, and interest on that amount to be computed at a rate of ten percent. However, we will REVERSE the judgment of the District Court to the extent that it orders the Fund to return the attorneys' fees and costs paid by Holmes.

---

ROSENN, Circuit Judge, dissenting.

The majority has fashioned a principle that eviscerates the intent of the Multiemployer Pension Plan Amendments

---

Retail. Thus, absent a clear statement to the contrary by the Supreme Court or our own court sitting en banc, we remain bound by Huber.

20

Act of 1980 ("MPPAA" or "the Act") and vitally undermines a pension fund's ability to enforce its judgment against a defaulting employer. Although the MPPAA provides for a six-year statute of limitations within which to initiate suits for the determination of the underlying pension liability, it is silent with respect to enforcement of judgments, leaving that aspect to existing state and federal laws. The enforcement of judgments often requires prolonged investigations in an effort to identify and find related entities and their resources. The majority expands the Act's six-year statute of limitations not only to govern an underlying claim for withdrawal liability against an employer, but also to deny the pension fund an opportunity to make factual determinations regarding the liability of related entities.

The evidence in this case shows that the employer shifted its liability among a tangled web of domestic and foreign corporate entities, frustrating the Trucking Employees of North Jersey Welfare Fund's (the "Fund") continuous efforts to collect pension liability under the mechanisms prescribed by ERISA and the MPPAA . The majority, by treating the judgment against the employer, Route Resources, as a nullity with respect to members of the "control group," thus enables the latter to evade statutory liability under the Act. I believe that the majority's expansive and unrealistic interpretation of the MPPAA's statute of limitations and its narrow view of the control group is contrary to the letter and purpose of the MPPAA, as well as the precedent in this circuit. Therefore, I respectfully dissent.

## I.

When drafting the MPPAA, Congress endowed the legislation with several key provisions designed to assist pension funds in collecting withdrawal liability from delinquent or evasive employers in situations such as the case at bar. The statutory scheme provides: (1) all trades or businesses in a "control group" will be treated as a "single employer," 29 U.S.C. § 1301(b)(1); (2) if a pension fund makes a factual determination that an employer has conducted a transaction for the primary purpose of "evading or avoiding" pension liability, the pension fund may disregard the transaction, 29 U.S.C. § 1392(c); (3) if an employer disputes a factual determination made by a pension fund, that dispute must be resolved through arbitration before a civil suit may proceed, 29 U.S.C. § 1401(a)(1); and (4) suits against an employer to collect withdrawal liability must be brought within six years of the accrual of the action, 29 U.S.C. § 1451(f).

In the seminal case of IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118 (3d Cir. 1986), this court recognized that a liberal construction of the MPPAA's provisions in favor of pension funds is consistent with the statute's legislative intent. 788 F.2d at 127 (citing H.R.Rep. No. 869, 96th Cong., 2d Sess. 71, *reprinted in* 1980 U.S. Code Cong. & Ad. News 2918, 2939).

Furthermore, "[c]ourts have indicated that because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans." Id. (citing Smith v. CMAT-IAM Pension Trust, 746 F.2d 587, 589 (9th Cir. 1984); Rettig v. PBGC, 744 F.2d 133, 155 (D.C. Cir. 1984)). In this case, the majority has disregarded these guideposts, and instead engages in a rigid construction of the MPPAA that is inconsistent with the statute, departs from the prior holdings of this court, and defies the MPPAA's legislative intent acknowledged by this and other courts.

There are two significant provisions in the MPPAA that underlie the analysis in this case. First, the MPPAA stipulates that pension funds may treat all trades and businesses under "common control" as a "single employer." 29 U.S.C. § 1301(b)(1).[19] This "single employer" principle allows pension funds to deal exclusively with the defaulting employer known to the fund, while at the same time assuring themselves that legal remedies can be maintained against all related entities in the control group. In Barker & Williamson, we derived from the MPPAA's "single employer" principle the logical corollary that notice of pension liability provided to one entity in a control

group constitutes constructive notice to all entities in the control group. 788 F.2d at 127. We noted the practical necessity for this principle, acknowledging that pension funds have no way of knowing ownership arrangements among closely held corporations. Id. at 128. The court reasoned that:

> [h]olding the fund responsible for providing notice to all other possible entities that might subsequently be deemed to be in a controlled group with the employer corporation would place the fund in an untenable position. In contrast, the stockholders and officers of corporations . . . certainly are aware of their holdings. If they choose to ignore . . . potential liability as a member of a controlled group under the MPPAA, then they should suffer the consequences if that issue is subsequently determined adversely to them.

Id.

Second, Congress acknowledged that employers owing significant pension liability may attempt to avoid their obligations through evasive transactions. See Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia, 830 F.2d 1241, 1248 (3d Cir. 1987). For example, a corporate entity with pension liability may be sold to a separate, undercapitalized corporate entity that then declares bankruptcy, thereby frustrating a pension fund's efforts to collect from the employer. To remedy this evasive practice, the MPPAA states that if the

---

[19] The MPPAA utilizes the definition of "control group" as prescribed in the Internal Revenue Code. 29 U.S.C. § 1301(b)(1).

22

primary purpose of a transaction is to "evade or avoid" pension liability, a pension fund may disregard the transaction, and "liability shall be determined and collected . . . without regard to such transaction." 29 U.S.C. § 1392(c). Notably, if an employer disputes a pension fund's determination that a transaction was primarily conducted to "evade or avoid" pension liability, the employer must seek arbitration to resolve this factual dispute before the court proceeding may continue. 29 U.S.C. § 1401(a)(1); Flying Tiger Line, 830 F.2d at 1248. Once in arbitration, Congress further tipped the scales in favor of pension funds by granting a presumption that any factual determination by the fund is correct, unless the employer shows by a preponderance of the evidence that the fund's finding was "unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A). The Supreme Court has interpreted this language to place the burden of persuasion on the employer during arbitration to "disprove a challenged factual determination by a preponderance." Concrete Pipes and Products of California, Inc. v. Construction Laborers Pension Trust of Southern California, 508 U.S. 602, 629 (1993).

## II.

The Fund's position in this case may be boiled down to two arguments that support its claim to collect pension liability from the Defendant/Appellee Robert Holmes ("Holmes"). First, as a factual matter, the Fund asserts that Holmes participated in a transaction intended to "evade or avoid" pension liability. Thus, as Congress provided in the MPPAA, the Fund may disregard the transaction and treat Holmes as a continuing member of the control group. 29 U.S.C. § 1392(c). Second, as a matter of law, the Fund argues that because it brought a claim against a member of the employer control group in 1995, it has satisfied the MPPAA statute of limitations, leaving the Fund free bring the present suit against Holmes as an action to enforce the 1995 judgment.

## A.

Through a combination of stock and trust, Holmes was the owner of Holmes Transportation, Inc., ("HTI"), Kero Leasing Corp. ("Kero") and other related personal proprietorships.[20] In 1988, Holmes transferred his interest in these related companies to Route Resources, a Canadian-owned holding company. The Fund points to significant evidence in the record indicating that Holmes' transaction was intended to evade pension liability. For example, Holmes originally signed a collective bargaining agreement with the Teamsters Local Union No. 560 in May of 1985, constituting his initial personal promise to make payments to the Fund.

---

[20] The Fund is able to bring an action against Holmes personally because he operated proprietorships under common control with Kero in his personal capacity without corporate protection.

Then, several months later in October of 1985, Holmes incorporated Kero and assigned the agreement (and the corresponding pension liability) to it. At that point, Kero had no apparent assets except the bare collective bargaining agreement. In what may have been a further attempt to isolate assets from liabilities, the record indicates that Holmes transferred a large piece of real estate in Framingham, Mass., worth over $10 million, from HTI to himself personally in December 1987, prior to conducting the sale to Route Resources. Next, Holmes transferred HTI's remaining assets into two shell corporations to facilitate the sale to Route Resources. Kero's stock, which may be better characterized as the large pension liability, was then transferred to Route Resources separately from the corporations now containing the assets.

Despite the sale, Holmes displayed an initial intent to remain involved with the companies through a fifteen year management consulting contract worth $4,725,000, which was included as part of the sale agreement. Yet, the parties walked away from the agreement after only a single payment of $78,750 covering three months of services. Not surprisingly, a bankruptcy trustee appointed for the HTI estate opined that the Route Resources transaction "was made upon insufficient consideration." Trucking Employees of North Jersey Welfare Fund, Inc. v. Route USA Real Estate, Inc., No. 90-4489, slip op. at 2 (D.N.J. May 23, 1991).

At some point in 1988, either during the negotiation of the alleged sale or soon after the transaction closed, Kero and/or Route Resources stopped making payments to the Fund. In July of 1989, shortly after the execution of the purchase agreement, Route Resources conveyed the capital stock of HTI to Anthony Matarozzo, the owner of Arrow Carrier, Inc. Six months later, HTI filed a petition in bankruptcy.

Almost immediately after Kero stopped making pension payments, the Fund did its best to follow this elusive chain of ownership and serve notice of withdrawal liability on the appropriate parties as required under the MPPAA. The Fund's efforts included several notice letters sent to Matarozzo from 1990 through 1992, as well as letters sent to Route Resources and Kero Leasing at their last known addresses. The Fund received no response until 1992, when Matarozzo finally informed the Fund that his purchase of HTI from Route Resources did not include Kero or Kero's pension liability. Thus, the Fund's pursuit of Matarozzo over a three year period was a red herring. Interestingly, the District Court in this case noted that when Anthony Matarozzo eventually responded to the Fund, he was in prison serving a sentence for theft from a separate pension fund. Bd. of Trustees of Trucking Employees of N. Jersey Welfare Fund, Inc. - Pension Fund v. Kero Leasing Corp., et al., No. 98-1476, slip op. at 4 (D.N.J. Oct. 26, 1999).

While the actual determination of whether this transaction was intended to

24

"evade or avoid" pension liability is a matter for arbitration, the claims presented by the Fund and reinforced by the District Court facially support a factual determination of evasive intent. This determination should not be undermined by Holmes' dubious effort to invoke the statute of limitations.

### B.

After years of frustration from chasing Kero's phantom owners, the Fund decided to switch tactics, retain new counsel, and address the matter in court. The Fund's new counsel brought an action in the U.S. District Court for the District of New Jersey in April of 1995 against Route Resources and its related companies to collect the withdrawal liability, again following the MPPAA procedures. Route Resources did not respond to the complaint, and the District Court awarded the Fund a default judgment.

The Fund argues that because the 1995 suit was brought within the six-year statute of limitations period under the MPPAA, it satisfied the statute of limitations as to all other entities in the same control group, due to the "single employer" principle. The Fund claims that because the MPPAA allows the Fund to treat all entities in a control group as a single entity, there can be only one judgment against that single entity. In short, "judgment against one is judgment against all." Therefore, all future litigation against other entities in the same control group, even if postured as new claims

under the MPPAA, should be construed as enforcement actions against the different entities comprising the "single employer."

The Fund believed that by bringing an initial suit against one member of the control group, it would satisfy the MPPAA statute of limitations and provide further time to investigate the complicated history of private transactions to find other resources to satisfy its judgment. The Fund was justified in this belief because courts in this circuit have consistently held that this approach is permissible under the MPPAA. Specifically, this same pension fund was the plaintiff in two prior cases before the New Jersey district court, raising almost identical claims. In Bd. of Trustees of Trucking Employees of N. Jersey Welfare Fund, Inc. v. Gotham Fuel Corp., 860 F.Supp. 1044, 1051 (D.N.J. 1993) and Bd. of Trustees of Trucking Employees of N. Jersey Welfare Fund, Inc. v. Able Truck Rental Corp., 822 F.Supp.1091, 1095 (D.N.J. 1993), Judges Ackerman and Lifland, respectively, held that under the MPPAA, members of a control group are "statutory alter egos."[21] Thus, as courts have held in other "alter ego" cases, Judges Ackerman and Lifland determined that the Fund's claims should be "*construed* as actions to enforce judgment" and will be considered timely

---

[21] This argument should not be confused with an alter ego claim brought under state common law. The MPPAA's "single employer" provision makes members of a control group "statutory" alter egos.

"if the underlying action against the corporation was timely and the subsequent action to pierce the corporate veil to enforce the judgment was brought within the limitations period for enforcement of judgments." Able Truck, 822 F.Supp. at 1095 (emphasis added) (citing Wm. Passalacqua Builders v. Resnik Developers South, Inc., 933 F.2d 131 (2nd Cir. 1991)). The use of the word "construed" is noteworthy, as it shows a willingness among the courts to read complaints liberally when a plaintiff is seeking to enforce a prior judgment under an "alter ego" theory, or the statutorily analogous "single employer" theory.

Although the complaints filed in Able Truck and Gotham Fuel are not a part of the record in this case, counsel for the Fund certified at oral argument before us that she was involved in those prior cases on behalf of the Fund. She stated that in those cases she filed substantially the same complaint that she filed in the present case. Based on counsel's explanation, which is further supported by the language of the district courts in Gotham Fuel and Able Truck "construing" the complaints as actions to enforce judgment, it appears that the complaints in all of these cases filed by the Fund used the same terminology. However, in the previous cases, the courts were

> persuaded that pursuant to the single employer concept adopted by the Third Circuit in Barker & Williamson, supra, only one withdrawal liability judgment can

exist against members of a controlled group. Thus, it follows that all subsequent actions against different members of a controlled group are actions to enforce the judgment previously entered . . . ."

Able Truck, 822 F.Supp. at 1095. The District Court opinion in the present case, as affirmed by the majority here, eviscerates the concepts set forth in Barker & Williamson, and imposes a highly technical pleading requirement that frustrates the letter and the intent of the MPPAA.

The majority here would prohibit the Fund from collecting its debt partly because it failed to adequately express the magic words "enforcement of judgment" in its complaint. However, even if this court would impose a strict pleading rule, requiring an explicit statement that an action seeks to enforce a prior judgment under ERISA, the complaint filed here by the Fund arguably would meet that requirement. The claim for relief pled all of the factual predicates required for enforcement of judgment, including acknowledgment of the 1995 judgment against Route Resources (paragraph 17), a factual determination that Holmes remained part of the control group due to his evasive transaction (paragraph 24), and a statutory basis for joint and several liability for the judgment among all control group members as required under the

26

MPPAA (paragraph 31).[22]

The majority's narrow view of the pleading, coupled with an impractical extension of the MPPAA statute of limitations requiring that actions to enforce an underlying judgment must also be brought within a six-year period, severely limits the purpose of the Act. I believe, in agreement with the district courts in Gotham Fuel and Able Truck, that the Fund satisfied the MPPAA statute of limitations when it brought the original suit against Route Resources in 1995.

---

[22] In an attempt to justify its position that this complaint cannot be read as an enforcement action, the majority discusses at length the legal steps taken by the Fund that can be interpreted to show an intent to pursue Holmes through a new action under the MPPAA. I believe that the actions referenced by the majority do not prohibit the Fund from asserting that its current action is intended to enforce the 1995 judgment. Rather, the multiple allegations put forth by the Fund to describe its claim against Holmes are better interpreted as alternate legal theories that the Fund pursued. Given the silence in the MPPAA regarding enforcement of judgments that we now attempt to resolve, and this particular Fund's past experience in Gotham Fuel and Able Truck, it is not surprising that the Fund pursued multiple theories of liability. The Fund should not now be penalized for its comprehensive approach to this litigation, much of which was initiated in response to the District Court's early rulings in the case.

Therefore, under the applicable New Jersey law, the twenty year statute of limitations for enforcement of judgment applies to the present suit to enforce the 1995 judgment. N.J. Stat. Ann. § 2A:14-5.

### III.

The majority attempts to distinguish Able Truck and Gotham Fuel on the facts by noting that in those cases, membership in the control group was conceded by the defendants, while in the present case, Holmes contests his control group status. The majority further holds that because six years expired prior to filing this suit against Holmes, the Fund is now prohibited from asserting that Holmes remained a control group member because his sale to Route Resources was intended to evade or avoid liability, effectively blocking the Fund from reaching Holmes' assets. Both of these arguments miss the mark.

### A.

First, by distinguishing Able Truck and Gotham Fuel based on Holmes' dispute of his control group status, the majority states in a footnote that it need not decide the crucial issue of whether the "single employer" theory requires that "judgment against one is judgment against all." Yet, in my view, we cannot effectively resolve this appeal without deciding this crucial legal question.

The importance of resolving

27

whether "judgment against one is judgment against all" is highlighted by a disagreement among several district courts across the country. For example, both the District Court opinion and the majority in this case draw support from a case decided in the Northern District of Illinois, Central States, Southeast and Southwest Areas Pension Fund v. Mississippi Warehouse Corp., 853 F.Supp. 1053 (N.D. Ill. 1994). Although the majority attempts to distinguish Mississippi Warehouse from Able Truck and Gotham Fuel on the facts, even a cursory reading of Mississippi Warehouse shows a fundamental legal difference between these cases. The district court in Mississippi Warehouse plainly stated its disagreement with the New Jersey cases and refused to adopt the rule construing secondary suits as enforcement claims under the "single employer" theory, regardless of whether the defendant conceded or contested control group status.[23] 853 F.Supp. at 1058.

Furthermore, the majority's effort to distinguish the New Jersey district court cases from Mississippi Warehouse and the present case based on the defendants' dispute of their control group status produces an untenable legal anomaly. The determination of whether a statute of limitations bars a suit cannot be affected, as the majority allows, by whether the defendant concedes or denies liability in the underlying suit. The operation of the statute of limitations is a legal concept, completely separate from the defendant's underlying defenses, or lack thereof. The majority's willingness to uphold a narrow interpretation of the MPPAA statute of limitations against those who concede liability, and yet apply a broader interpretation when the underlying liability is disputed, confuses the issue and fails to address the operative legal principle at bar. The majority position essentially means that if a defendant challenges his underlying liability in an action to enforce an MPPAA judgment, he can obtain the benefit of an abbreviated statute of limitations. Such a legal concept has no basis in the law, nor should it.

B.

Second, the majority acknowledges that the MPPAA requires disputes involving the "evade or avoid" provision to be resolved through arbitration. 29 U.S.C. §§ 1392(c), 1401(a)(1). However, the majority adopts the non sequitur that because the process for resolving the "evade or avoid" issue is prescribed under the MPPAA statutory framework, the six-year statute of limitations also applies as a bar to resolving this issue. There is absolutely no support in the MPPAA or the prior case law for this proposition, and the majority cites to none.

The statute of limitations in the

_____

[23] The court in Mississippi Warehouse only recognized the factual distinction from the New Jersey cases in a footnote, while discussing its disagreement on the law extensively in the body of the opinion. 853 F.Supp. at 1058, n.2.

MPPAA clearly refers to "*action[s]* brought under this section." 29 U.S.C. § 1451(f) (emphasis added). On the other hand, the MPPAA's arbitration provision requires that "*disputes* between an employer and the plan sponsor . . . concerning a *determination* made under sections 1381 through 1399 of this title shall be resolved through arbitration."[24] 29 U.S.C. § 1401(a)(1) (emphases added). Section 1401(a)(1) refers to "disputes" concerning "determinations" because the items in sections 1381 through 1399 are all *factual determinations* that the MPPAA entrusts to the discretion of the Fund. These factual determinations, such as whether a transaction was intended to "evade or avoid" liability, are not causes of action in and of themselves subject to the MPPAA statute of limitations. Rather, as the Supreme Court acknowledged in Concrete Pipes, they are "factual determinations" to be resolved through arbitration before a civil suit may proceed. 508 U.S. at 629. The majority's expansive application of the statute of limitations covering not only an original claim, but also the Fund's ability to make factual determinations regarding an evasive transaction as part of an effort to enforce judgment, is contrary to a reasonable construction of the statute. Also, it is contrary to this court's

---

[24] The "evade or avoid" provision, 29 U.S.C. 1392(c), falls within the applicable range of sections 1381 through 1399, thereby designating it as a determination subject to arbitration.

acknowledged duty to interpret ERISA and the MPPAA liberally as remedial statutes. Barker & Williamson, 788 F.2d at 127.

I believe that the majority ultimately errs in its interpretation of the MPPAA by treating the question of whether Holmes can be considered a member of the control group as the threshold issue. The majority holds that regardless of whether the statute of limitations will be satisfied by a prior, timely claim against a member of the control group, this particular suit may not proceed because the statute of limitations bars the Fund from asserting that Holmes is still a member of the control group against whom the prior judgment may be enforced. I believe that this approach is ill advised, given the ability of employers in close corporations to hide their evasive intent behind a thicket of private transactions that may take several years to untangle, as occurred in this case.

Our review should be limited to the legal question of whether the "single employer" principle requires that a timely claim against one control group member satisfies the MPPAA statute of limitations, leaving future actions against other control group members to be governed by the applicable state law statute of limitations for enforcement of judgment. If, as I suggest, the answer is affirmative, then the current action should be allowed to proceed as an enforcement suit. The MPPAA would then require recognition of the Fund's factual determination that Holmes should be treated as a member of the control group because his sale was

primarily intended to "evade or avoid" liability. If Holmes wishes to dispute that factual finding, he may do so in arbitration, as required under the MPPAA, before the claim proceeds in the District Court. Flying Tiger Lines, 830 F.2d at 1248.

IV.

The majority contends that allowing this suit to proceed against Holmes in such a "belated" manner would be somehow unfair to Holmes, given that he sold his companies in 1988 and retired to Florida. This approach punishes the Fund for its investigation and delayed legal action, despite evidence that Holmes and Route Resources may have engineered a scheme designed to conceal assets from the Fund and obstruct detection of the culpable entities. Our court has held on several occasions that factual determinations regarding evasive transactions are left for pension funds and arbitrators to decide. The Fund's factual determination should not be disregarded by granting summary judgment on the basis of an affirmative defense. Such a decision denies the Fund the opportunity set forth in the Act to challenge evasive and fraudulent transactions and transfers. We need only verify that Holmes was a member of the control group at some time prior to withdrawal from the Fund, and leave the resolution of this factual dispute to arbitration. See Bd. of Trustees of Trucking Employees of N. Jersey Welfare Fund, Inc. – Pension Fund v. Centra, 983

F.2d 495, 501 (3d Cir. 1992). This court should limit its inquiry to the legal question of whether the MPPAA statute of limitations bars this suit. To that end, the majority has fashioned a six-year time limit that applies to a pension fund's original suit on the underlying claim, as well as all efforts to enforce a judgment against entities later determined to be members of the control group. Such a rule encourages employers to impede the collection of monies lawfully due pension funds and negates the arbitration provisions of the MPPAA for the factual determinations of whether members of the control group engaged in evasive and fraudulent schemes. The MPPAA never intended such a result. Furthermore, the majority's rule is based, in part, on the unsupportable ground that it applies only to situations where a defendant disputes control group status that has not yet been conclusively determined by a court or arbitrator. As a result, the majority establishes an illusory dichotomy that avoids the operative legal issue.

I would affirm this circuit's line of MPPAA cases by following the precedent set in Barker & Williamson. I would hold that judgment against one control group member shall be deemed judgment against all, construe the Fund's claim as an action to enforce the 1995 judgment, vacate the summary judgment against the Fund in this proceeding, and remand the case to the District Court for further proceedings

consistent with this opinion.[25]

---

[25] Because my analysis of this case would vacate the District Court judgment, I do not reach the issue of whether Holmes is entitled to interest payments and attorneys' fees